## UNITED  STATES  DISTRICT  COURT
## EASTERN DISTRICT OF LOUISIANA

DAVID LADNER                                                    CIVIL ACTION

versus                                                          NO.  04-3468

UNUM LIFE INSURANCE COMPANY                                     SECTION: E/2
OF NORTH AMERICA

### RULING ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on defendant's, Unum Life
Insurance Company of North America ("Unum"), motion for summary
judgment.  Rec. Doc. #26.  Plaintiff David Ladner ("Ladner")
filed an opposition to the motion.  The matter was considered on
the briefs, and the Court is now prepared to rule on the motion.

### BACKGROUND

This is an ERISA case.  Ladner filed suit against Unum
alleging that he is entitled to disability benefits under the
long term disability policy, Policy No. 00022547-0001, issued by
Unum and purchased by Ladner's employer, Entergy Louisiana, Inc.
("Entergy").  Ladner was born on May 29, 1968, and received a
high school degree.  He was hired by Entergy on May 28, 1986, and
worked there for thirteen years. (UACL 00011)[1]  On January 28,
1999, while working as a lineman[2], Ladner was struck on the head
and neck when a co-worker lowered his aerial work bucket

---

[1] The administrative record includes a copy of the policy at issue and
the entire claim file.  It is bates stamped with pages numbered UACL 00001
through UACL 00694.  The Court will use these UACL page references.

[2] At that time, he had held the position of "Senior Mechanic Line" for
seven years, making $22.94 per hour.  (UACL 00011).

onto the work bucket in which Ladner was working.[3]  (UACL 00573, 00472, 00193-195, 00016)  About three to seven days later, Ladner began to suffer headaches, pain and soreness.[4]  He first sought medical treatment on approximately March 10, 1999, and stopped working on May 24, 1999.  He explained in his Long Term Disability Claim Employee's Statement, signed on October 29, 1999, that he stopped working "because of the concussion, pain, medication, insomnia, and the extreme risk of my job."  (UACL 00016).

On January 24, 2001, Unum notified Ladner that his claim for disability benefits was approved from November 21, 1999[5], through December 20, 2000, paid under the mental illness policy provision which limited payment of benefits to a maximum 24 month period. (UACL 00315-00320).   On May 9, 2001, Unum determined that his mental illness disability benefits would be continued. (UACL 334) On November 27, 2001, Unum's in-house medical staff reviewed Ladner's claim and advised that the medical records provided no restrictions or limitations from a general medical

---

[3]An aerial bucket is a large, heavy bucket, large enough to hold a person, that extends from a bucket truck and from which a lineman works from thirty-four to seventy feet above the ground.  Ladner was in another bucket, and was wearing a hard hat at the time he was struck.  He did not immediately report the accident or any injury although he described it as a hard hit. (UACL 00016)

[4]See, generally, UACL 00001-00016.

[5]The policy had a 180 day elimination period, that extended from May 25, 1999 through November 20, 1999.  (UCAL 00320).

standpoint(UACL 00350-351), and on January 7, 2002, Unum notified Ladner that it was closing his file in accordance with the 24-month limitation period for payments under the mental illness provision for the policy. (UACL 00355-358). Ladner was advised to exercise his administrative appeal rights within 90 days of his receipt of the letter if he disagreed with Unum's determination. <u>Id.</u>

About eighteen months later, on May 27, 2003, Ladner for the first time (by telephone) requested that his file be reopened and that he be awarded long term disability benefits. (UACL 00360, 509). On June 24, 2003, after a review of the claim and the medical records, Unum notified Ladner that his appeal of its denial of long term disability benefits for the period from November 21, 2001 forward was denied. (UACL 00523-526). Through his counsel, on October 29, 2003, Ladner again appealed the decision to deny benefits. Again, after a review of the updated medical records provided by Ladner's counsel, on November 21, 2003, the appeal was denied. It is this denial of Ladner's claim for long term disability benefits that is the subject of this lawsuit.

Under the Unum policy, for Ladner to be eligible for long term disability benefits beyond the initial 24 months for which he was paid, he must show that he is entitled to benefits under the "any gainful occupation" prong of the definition of

"disabled", rather than the claimant's "regular occupation" prong.  (UACL 000523).  The issue before the court is whether, in November 2001, Unum's decision to deny long term disability benefits was supported by the evidence in the claims record, that is, whether Ladner had produced to Unum sufficient evidence to show that he was medically unable to perform "any gainful occupation."

## ANALYSIS

A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L. Ed. 3d 265 (1986).  An issue is material if its resolution could affect the outcome of the action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).  However, once a moving party properly supports a motion for summary judgment, the nonmoving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."  Lawrence v. Univ. of Tex. Med. Branch at Galveston, 163 F.3d 309, 311-12 (5th Cir.

1999), *quoting* <u>Wallace v. Texas Tech. Univ.</u>, 80 F.3d 1042, 1047–48 (5th Cir. 1996).  The nonmoving party cannot satisfy its burden with "unsubstantiated assertions" or "conclusory allegations."  <u>Id.</u>

### *ERISA Standards of Review*

It is undisputed that the policy at issue vests Unum with the discretionary authority to determine eligibility for benefits and to interpret the terms and provisions of its policy in making benefit determinations.  (UACL 00641, 621). Ladner argues that where an employer contracts with a third party, as is the case here, that both insures and administers the benefit plan, the administrator of the plan has an inherent conflict of interest which must be weighed as a factor in determining whether there was an abuse of discretion.  The Court disagrees.

The Fifth Circuit has recognized some modification of the abuse of discretion standard in such a situation where the insurer could potentially benefit from the denial of a claim.  <u>Vega v. National Life Insurance Services</u>, 188 F.3d 287, 295 (5th Cir. 1999).  However, the Fifth Circuit does not recognize the *presumption* that such a conflict exist, and requires that an "ERISA plaintiff must come forward with evidence that a conflict exists - and that any reduction in the degree of our deference depends on such evidence - ...."  <u>Ellis v. Liberty Life Assurance co. of Boston</u>, 394 F.3d 262, 270 n.18 (5th Cir. 2005) citing

MacLachlan v. ExxonMobil Corp., 350 F.3d 472, 479 n.8 (5th Cir. 2003).  As Ladner has offered no evidence of such a conflict, no modification of the abuse of discretion standard of review is required.

Case law provides for different applications of the abuse of discretion standard depending on whether the ERISA plaintiff challenges the administrator's determination of facts underlying the plan, or the administrator's interpretation of the plan terms.  In his petition, Ladner challenges Unum's factual determination that he does not meet the relevant policy definition of disabled, that is, that he is "unable to perform the duties of any gainful occupation for which he is reasonably fitted by education, training or experience."  Petition, ¶ VIII. He does not challenge Unum's interpretation of the policy terms or provisions.  A determination that a plan participant is not disabled under the terms of a disability policy is a factual determination subject to review under an abuse of discretion standard.  Sweatman v. Commercial Union Ins. Co., 39 F.3d 594, 601 (5th Cir. 1994).

The scope of the district court's review in assessing Unum's factual determination to deny benefits is limited to a review of the administrative record.  Vega, 118 F.3d at 299.  "The administrative record consists of relevant information made available to the administrator prior to the complainant's filing

-6-

of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it."  Id., at 300; Estate of Bratton v. Nat'l Union Fire Ins., 215 F.3d 516, 521 (5th Cir. 2000). Therefore:

> a district court must inquire only whether the "record adequately supports the administrator's decision"; from that inquiry it can conclude that the administrator abused its discretion if the administrator denied the claim "without some concrete evidence in the administrative record."

Gooden v. Provident Life & Accident Ins. Co., 250 F.3d 329, 333 (5th Cir. 2001).

### *Relevant Unum Policy Terms*

The insurance policy at issue includes the following provisions:

**HOW LONG WILL UNUM CONTINUE TO SEND YOU PAYMENTS?**

UNUM will pay you benefits each month until the earliest of the following events:

-the date you are no longer disabled;
-the date you fail to furnish proof that you are continuously disabled;

(UACL 00027).

**HOW DOES UNUM DEFINE DISABILITY?**

You are disabled when Unum determines that you are either totally disabled or partially disabled.

You are totally disabled when Unum determines that:

-during the elimination period and for the next 24 months you are **limited** from performing all the **material and substantial duties** of your regular occupation due

to your **sickness** or **injury**; and

- after 24 months of payments Unum determines that due
to the same sickness or injury, you are unable to
perform the duties of any **gainful occupation** for which
you are reasonably fitted by education, training, or
experience.

(UACL 00634) (Emphasis in original).

**GAINFUL OCCUPATION** means an occupation that is or can
be expected to provide you with an income at least
equal to your gross disability payment within 12 months
of your return to work.

(UACL 00633).

*Chronological Review of Administrative Record and Argument*

The following is a chronological itemization of information

contained in the administrative record as of November 2001, the

time Unum determined that Ladner was no longer entitled to long

term disability payments:

October, 1999:  Entergy filed a Statement dated October 15, 1999,

stating that Ladner has last worked on May 24, 1999 (UACL 00009-

00011), and Ladner submitted a Long Term Disability Claim dated

October 29, 1999, stating that he could not work because of "the

concussion, pain, medication, insomnia, and the extreme risk of

my job."  (UACL 00015-00016).

November 1999:  Dr. John Bick, Ladner's treating psychiatrist,

submitted an attending physician's statement dated November 19,

1999.  (UACL 00012-13).  Dr. Bick first saw Ladner on August 25,

1999, but reported that symptoms first appeared on February 1,

1999, after a work accident precipitated "severe psychotic symptoms." He diagnosed "major depression" with symptoms of marked memory complaints, marked hypochondriacal complaints, problems with sleep and appetite. His objective findings included "flat affect, speech rambling at times, paranoid thinking", and the limitations noted were "unable to interact with others appropriately because of marked hypochondriosis, unable to do anything that is at all stressful." His prognosis was "guarded." Dr. Bick remarked that Ladner was "psychiatrically, a very complex and difficult patient."

January 11, 2000: Unum received medical records from Touro Infirmary (UACL 00092-00111), which included a June 1999 neuropsychological evaluation conducted by John Fanning, Ph.D., a Clinical Neuropsychologist (UACL 00099-00107). Fanning indicated "considerable concern with regard to the validity of the extensive test data obtained from Mr. Ladner" for the following reasons: (1) the atypical presentation, which seemed initially to involve orthopaedic pain, but later showed considerable spread of identified symptomatology to include what Ladner described as very problematic cognitive effects, personality and behavior change, and other sequelae; (2) Fanning found Ladner's "own behavior and responses during assessment disquieting." For example, Ladner refused to authorize the release of his school records, and "focused more acutely and persistently on this

question of premorbid functioning more markedly than any other patient I have ever tested"; (3) "the pattern of test results produced by [Ladner] are not typical of those usually exhibited by patients who have sustained mild head injury" showing "relatively poor results in some areas which are usually unaffected by mild head injury, and did quite well in other areas which are far more frequently affected"; and (4) test results yielded scores more characteristic of experimental pseudo-malingering groups than of patients with documented brain injuries.  Fanning noted that Ladner was treating his depression with anti-depressants, and that from a psychological standpoint, he had no further recommendations.  (UACL 0009-00107).

January 24, 2000:  Unum's in-house physician, Dr. Tanya Horne, Board Certified in Family Practice, reviewed Ladner's claim.  Dr. Horne reviewed records from Lakeview Regional Hospital from an ER visit on 3/12/99; records from Kenner Regional Medical Center from an ER visit on 3/25/99; chiropractor records from December 1998 - May 1999; letter from Dr. Rosenbloom to Unum dated 12/15/99; letter from Dr. Richard Spector (ENT) to Dr. Rosenbloom re visit on 5/28/99; and the results of the neruopsychiartic testing from 5/26/99 to 6/7/99.  Dr. Horne concluded that Ladner's subjective pain complaints were out of proportion to the objective findings, that there was no clear diagnosis of post-concussive syndrome, and based on the "neuropsych test", there

was a strong possibility of malingering.  She recommended
obtaining the treatment notes from Drs. Bick and Rosenbloom.
(UACL 000118-121).

January 27, 2000:  Unum received treatment notes from Dr.
Rosenbloom for the period from May 17, 1999 through December 15,
1999. (UACL 00123-138).  Dr. Rosenbloom is a specialist in
physical medicine and rehabilitation.  He noted an impression of
possible post-concussive syndrome with low pain tolerance and
possible chronic pain syndrome involving primarily soft tissues.
He also observed that Ladner's "mental status abnormalities
appear primarily psychiatric", and deferred to Dr. Bick's
evaluation and treatment recommendations.

February 7, 2000:  Unum notified Ladner by letter that it had not
received Dr. Bick's treatment notes, and it would close the file
in 30 days if the requested notes were not received.  (UACL
00175-176).

March 9, 2000:  Unum notified Ladner by letter that his file had
been closed.  (UACL 00177-178).

November 5, 2000:  Ladner contacted Unum by telephone and was
told to send a written request to have his claim reconsidered.
(UACL 00183).

November 14, 2000:  Unum received a letter from Ladner
(postmarked Nov. 14, 2000, but dated "November 2000") requesting
that his claim be reconsidered.  (UACL 00182-184).

November 30, 2000:  Unum, by memo from Dan Clark, agreed to re-
evaluate Ladner's claim and assist him is collecting the
necessary medical information.  (UACL 00185).

December 12, 20, 2000: Unum advised Ladner by mail that it needed
additional medical information.  (UACL 00293, 00296).

UNDATED:  Unum's in-house medical staff reviewed Ladner's records
and claim, including Dr. Bick's November 19, 1999, attending
physician's statement indicating a diagnosis of severe major
depressive disorder without psychotic features.  The review
concluded that the diagnosis appeared to be supported, but
current records were needed.  (UACL 00297-300).

January 24, 2001:  Unum notified Ladner by letter that his claim
for benefits had been approved from November 21, 1999 through
December 20, 2000, and advising that his benefits were being paid
under the mental illness policy provision which limited payment
of benefits to a 24 month maximum period of payment. (UACL 00315-
320).

February 7, 2001:  Unum sent a medical supplement form for Ladner
and his treating physician, Dr. Bick, to complete and return by
March 7, 2001.

May 8, 2001:  Ladner faxed to Unum his supplemental statement,
Dr. Bick's supplemental statement, and a functional capacities
evaluation ("FCE") and mental status questionnaire completed by
Dr. Bick.  Dr. Bick advised that his primary diagnosis was "major

-12-

depression" and that his treatment consisted of psychotherapy on a weekly basis.  He issued restrictions and limitations of unable to work because of pain complaints and depression.  (UACL 00328-331).  Based on the FCE, Dr. Bick indicated that Ladner's condition was a moderate level of severe impairment of his ability to relate to other people; to attend meetings; to socialize; to attend personal needs; to show interest in something; to respond appropriately to supervision; to perform repetitive tasks; to perform varied tasks; to make independent judgments; and to perform under stress when confronted with emergency, critical, unusual, or dangerous situations.  Id.

May 9, 2001:  Unum determined that Ladner's benefits would be continued and referred his file for periodic update.  (UACL 00334).

May 21, 2001:  By letter to Dr. Bick, Unum requested responses to specific questions relating to his projected maximum medical improvement ("MMI") of Ladner's condition.  (UACL 00347).

June 28, 2001:  Dr. Bick responded that he had recommended a physical medicine and rehabilitation ("PM&R") reevaluation, but that Ladner had rejected his recommendation.  He then opined that barring the PM&R, Ladner "will reach MMI, psychologically, at the end of July 2001."  Id.

July 27, 2001:  By correspondence, Unum asked Dr. Bick if Ladner had indeed reached MMI as Dr. Bick had previously suggested.

-13-

(UACL 00348).

August 22, 2001:  Dr. Bick responded that in his opinion, Ladner hard reached MMI "from a psychiatric perspective."  Id.

September 19, 2001:  Ladner telephoned Unum to ask what he could do to get his benefits continued beyond the 24 month mental health mental illness maximum benefit period.  (UACL 00346). He was advised by his Customer Care Representative to send medical records relating to his claimed physical injuries for review by Unum's in-house physicians.  Id.

November 27, 2001:  Unum's in-house physician, Scott Farley, conducted a clinical review of Ladner's medical file.  He noted that on January 24, 2000, Dr. Horne had observed that there was no support for a diagnosis of Post Concussion Syndrome.  He also noted that an IME was done in April 1999 by Dr. Howard Katz who specialized in physical medicine and rehabilitation.  Dr. Katz stated that the claimant had complaints of headaches with no objective evidence of neurological or orthopedic problems, and suggested probable mild TMJ dysfunction, probable cervical strain, and possible low back strain.  Dr. Farley's review included reference to Dr. Provenza, a neurologist, who noted a severe cervical and lumbar strain, and concussion with pituitary dysfunction.  Dr. Farley reviewed the findings of Dr. Miranne, a neurosurgeon, in June 2000, finding a wide constellation of symptomology, not compatible with cervical or lumbar disease, and

-14-

noting that there was a possible emotional or psychiatric problem
underlying Ladner's symptomology.  In May 2001, Ladner had
reported that he was taking no medications, and the record
contained no restrictions and limitations from a general medical
standpoint.  (UACL 00350-351).

January 7, 2002:  Unum notified Ladner by letter that it was
closing its file in accordance with the 24 month limitation on
payments under the mental illness provision of the policy, and
discussed the lack of support for any currently claimed physical
or general medical impairment or recent documentation confirming
that he had a severe disabling condition.  Unum advised Ladner
the exercise his administrative appeal rights within 90 days of
the receipt of the letter.  (UACL 00355-358).

On May 27, 2003, Ladner contacted Unum by telephone that he
would be sending medical records to re-open his file.  (UACL
00360).  By letter dated June 5, 2003, Ladner requested an
administrative appeal of Unum's benefit determination, enclosing
medical records along with his worker's compensation file.  (UACL
00509, 00363-508).  For the first time, Ladner provided medical
records and treatment notes from Drs. Provenza and Trahant, a
neurologist, both of whom had been treating Ladner for several
years.  The claim file was reviewed on June 23, 2003, by another
Unum in-house physician, Dr. Robert Hill, Board Certified in
Family Practice.  Dr. Provenza's October 10, 2001 notes included

reference to a cervical discogram performed on October 1, 2001, which presented abnormal interspace locations at C5-6 and C6-7. (UACL 465, 459-460).  However, the finding was deemed insignificant by Dr. Trahant, and Dr. Provenza's notes consistently described Ladner's pain complaints as "normal physical exams except for some descriptions of limited range of motion of neck and or back."  Id., (UACL 00432-443, 00459-460). Dr. Hill noted that Dr. Trahant specifically indicated, based on his evaluation of Ladner on December 10, 2001, after the October cervical discogram, that Ladner did not have any objective signs of cervical radiculopathy or myelopathy and that the 10/01 cervical discogram findings were not clinically significant. (UACL 00516, 459-460).  Dr. Hill concluded that the medical records did not contain any physical findings consistent with Ladner's pain complaints, and contained no documentation to support any deficit in physical, functional capacity from a general medical standpoint.  Id.  On June 24, 2003, Unum notified Ladner of its decision to uphold the denial of long term disability benefits.  (UACL 00525-526).

In a letter dated July 16, 2003, Ladner's counsel demanded payment of long term disability benefits and included copies of medical records from Dr. Provenza dated January 17, February 14, may 21 and June 20, 2003.  Also by letter, dated October 29, 2003, Ladner's counsel submitted a neuropsychological evaluation

by Dr. Andrews, dated September 11, 2003, which concluded that Ladner's symptoms were of an orthopedic and endocrine nature or related to the pituitary and the brainstem and that the reported personality changes and emotional dyscontrol were consistent with injuries in several areas of the brain.  (UACL 00587-599).  Unum again conducted a medical review of the information provided in both correspondences, and both times determined that the documentation did not alter the underlying finding that, based on the medical information available to them regarding Ladner's condition in November 2001, he no longer met the policy definition of disabled.  (UACL 00582-584, 00607-609).  This lawsuit followed.

Ladner argues that Unum erred in relying on its "family medicine" doctors' review of a specialist's medical records, and when it relied on a medical report from a physician (Dr. Trahant) who reviewed Ladner's records regarding his workers' compensation claim.  He argues that Unum abused its discretion when it did not give deferential weight to the opinions of his treating physicians.  The Supreme Court addressed this issue in <u>Black and Decker Disability Plan v. Nord</u>, 123 S.Ct. 1965 (2003).  It held that "ERISA" does not require plan administrators to accord special deference to the opinions of treating physicians, nor is a "heightened burden of explanation" imposed on administrators when they reject a treating physicians opinion.  <u>Id.</u> at 1970.

-17-

It is undisputed that Unum paid Ladner long term disability benefits for the full 24 months allowed by the policy for disability payments for mental illness.  It is also undisputed that under the terms of the plan, it was Lander's obligation to furnish Unum proof that, at the end of that 24 month period, he was continuously disabled from some disability other than mental illness, that is, that he was unable to perform the duties of any gainful occupation for which he was reasonably fitted by education, training, or experience.  Finally, the medical documentation and facts as reported in the administrative record are not in dispute.

Ladner argues that there are disputed issues of material facts because the administrator relied on incorrect and disputed medical information to justify denial of his long term disability claim.  Memorandum in Opposition to Motion for Summary Judgment, p. 16.  Essentially, Ladner complains that Unum did not rely on the sparse medical documentation he provided that could support his claim of a continuing general medical disability as of November 2001.  He argues that he had documented that he suffered from severe physiological complaints dating back to 1999, and that Unum ignored that evidence in making its determination to terminate his disability benefits after the 24 month period he was considered disabled because of mental illness.  Ladner also asserts that Unum had substantial *new* information regarding his

ongoing physical problems in 2003 when it denied his appeal of its termination of his disability benefits as of November, 2001.

As Ladner argues, the medical information that he belatedly provided to Unum in support of his administrative appeals does include references to the possibility of physiological injuries or issues supporting his complaints of pain.  However, as Unum's medical staff noted, Dr. Provenza had repeatedly referred Ladner for an endocrinology evaluation as early as 1999, but Ladner never followed through with the recommendation so there is no definitive diagnosis in the record. (UACL 00602).  Moreover, while the October 2001 cervical discogram showed some apparent abnormality, it does not appear that any physician who reviewed the findings determined that the abnormality was significant, or that it caused Ladner to have any general medical restrictions or limitations.  In his letter dated December 6, 2001, Dr. Trahant stated that he found "no evidence of significant pathology relative to his cervical spine," noting that "his MRI of the cervical spine is negative, as is EMG/nerve conduction study."  (UACL 00460).

In short, there is significant concrete evidence in the administrative record to support Unum's determination that Ladner had not shown that in November 2001 he was unable to perform the duties of any gainful occupation for which he was reasonably fitted by education, training, or experience, and therefore he

was no longer eligible for long term disability benefits under the plan.  Because there is no dispute as to a material fact at issue, Unum is entitled to summary judgment as a matter of law.

Accordingly,

**IT IS ORDERED** that Unum's motion for summary judgment is **GRANTED.**

New Orleans, Louisiana, April 19, 2007.

**MARCEL LIVAUDAIS, JR.**
Senior United States District Judge